IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF Dark Blue iPhone 15, CURRENTLY LOCATED AT The FBI, 5425 W Amelia Earhart Dr, Salt Lake City, UT 84116 | Case No. 2:24-mj-01170 CMR |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jonathan Rich, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation and have been since 2014. I have received investigative training at the Federal Bureau of Investigation academy relating to Public Corruption, Money Laundering, Wire Fraud and other violations of federal law. I have worked as an Agent on multiple squads to include investigating violent crimes, Public Corruption and gang violations, which often involved cellular telephones and other technical matters.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is a dark blue Apple iPhone 15 with a clear case, hereinafter the "Device." The Device is currently located in the Evidence Control Room at the Federal Bureau of Investigation ("FBI") at 5425 W. Amelia Earhart Drive, Salt Lake City, Utah.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. Subjects, Marcus Delgado ("Delgado"), Jesse DeJarnette ("DeJarnette") and Jairo Jasso ("Jasso") were employees of Panhandle Power Solutions, LLC ("Panhandle"). DeJarnette was the Electrical Superintendent, Delgado was his deputy, and Jasso was their coworker.

7. Panhandle was contracted by the United States Government to build an aircraft hangar at Hill Air Force Base ("HAFB"), in Utah. Panhandle purchased over $500,000 worth of copper wire for use as part of this construction project.

8. Between September 2023 through around November 2023, Delgado, Jasso and DeJarnette did conspire together to take the copper wire from Panhandle and sell it for scrap at Metro Group, Inc. ("Metro"), a scrapyard in Ogden, Utah.

2

9. Delgado, DeJarnette, and Jasso while working at Panhandle at HAFB, had access to the copper wire purchased by Panhandle. Delgado, DeJarnette, and Jasso, took the wire, and sold it for scrap at Metro.

10. Delgado, DeJarnette, and Jasso then took the money from the sale of the copper wire and laundered it through spending, various account deposits, and transfers.

11. Delgado took the copper wire owned by Panhandle for use in construction at HAFB, brought it to Metro and represented to Metro that he had authority to sell the wire.

12. On September 19, 2023, Delgado cashed a check from Metro for $8,754.16 and then deposited $2,600 in cash into his Wells Fargo Bank account on September 21, 2023.

13. On September 20, 2023, DeJarnette deposited $2,800 in cash into his Alliant Credit Union account at an America First Credit Union ATM in Layton, Utah.

14. On September 27, 2023, Delgado deposited a check from Metro for $12,781.56 into his Wells Fargo Bank account. Delgado also deposited $4,250.00 in cash into the same account while at the Layton branch in Layton, Utah. Delgado then purchased a cashier's check in the amount of $4,250.00 using the same account at the Layton branch.

15. On September 27, 2023, DeJarnette deposited $4,250.00 into his Alliant Credit Union account ending in #8912 through an online mobile banking deposit.

16. On September 29, 2023, Delgado, DeJarnette, and Jasso loaded copper wire into a truck and were seen crushing the copper wire to make it appear as scrap.

3

17. On September 30, 2023, Delgado, DeJarnette, and Jasso loaded copper wire into a truck and were seen crushing the copper wire to make it appear as scrap.

18. On September 30, 2023, Delgado, obtained a check from Metro for $40,078.35. He cashed this check on October 2, 2023, he deposited $20,078.35 in cash into his Wells Fargo account at an Ogden Wells Fargo branch.

19. On October 2, 2023, DeJarnette made at least six separate deposits including, $1,000, $2,000, $2,000, $1,000, $2,500 and $2,500 for a total of $11,000. These deposits were all made via ATM at an America First Credit Union branch in Roy, Utah.

20. On October 10, 2023, Jasso made multiple cash deposits in the amounts of $3,000, $2,000, $400, $600, $600, $400, $3,000, and $3,000 into his Wells Fargo bank account. Jasso made the deposits at a Wells Fargo branch in Ogden, Utah.

21. On October 11, 2023, Jasso deposited $4,000 into his Wells Fargo bank account via electronic deposit at a Wells Fargo branch in Houston, Texas.

22. The aforementioned deposits of cash and checks into Delgado, DeJarnette, and Jasso's bank accounts correspond with the amounts and timing of the money received from Metro for the scrap of the stolen copper wire stolen from HAFB.

23. Delgado, DeJarnette, and Jasso did knowingly and intentionally combine, conspire, confederate, and agree with each other to:

> (a) conduct financial transactions affecting interstate and foreign commerce, knowing that the transactions were designed in whole or in part to avoid a transaction reporting

4

requirement under State or Federal law, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, that is, wire fraud, contrary to Title 18, U.S.C. § 1956(a)(1)(B)(ii); and

(b) engage in monetary transactions by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is wire fraud, contrary to Title 18, U.S.C. §1957.

24. Delgado, for the purpose of executing and in furtherance of the scheme to artifice to defraud and to obtain money and property from Panhandle by means of materially false and fraudulent pretenses, representations, and promises, and omissions of material facts, caused the aforementioned checks from Metro to be transmitted by means of wire communication in interstate commerce.

25. On October 9, 2024, Delado, DeJarnette and Jasso were indicted by a federal Grand Jury for the aforementioned acts. The indictment was based on Delgado, DeJarnette, and Jasso stealing the copper wire, scrapping the copper wire at Metro and then the aforementioned transactions with proceeds from the sale of the captioned copper wire.

26. From April 2023 through January 2024, Delgado and DeJarnette had over 2500 contacts between voice calls and text messages. Between April 2023 and March 2024, Delgado and Jasso had more than 600 contacts between voice calls and text messages. Between April 2023 and October 2023, DeJarnette and Jasso had more than 50 contacts between voice calls and text messages.

27. On November 14, 2024, Delgado stated that Delgado, DeJarnette and Jasso all spoke on the phone and sent text messages regarding the theft and subsequent scrapping of the copper wire.

28. On November 14, 2024, Jasso shared with the FBI a picture sent by DeJarnette to Jasso on Jasso's cellular phone. The picture was sent by DeJarnette on September 19, 2024 and was a METRO check for $8,574.16.

29. The Device is currently in the lawful possession of the FBI. It came into the FBI's possession when it was seized incident to Delgado's arrest on November 14, 2024. The Device was on Delgado's person when he was arrested. Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

30. The Device is currently in storage at the Evidence Control Room at the FBI at 5425 W. Amelia Earhart Drive, Salt Lake City, Utah. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## TECHNICAL TERMS

31. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This

8

removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

32. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at apple.com/iPhone, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS Navigation, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

33. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

34. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

9

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

10

35.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

36.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

37.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Jonathan Rich
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on December 10, 2024:

CECILIA M. ROMERO
UNITED STATES MAGISTRATE JUDGE



## ATTACHMENT A

The property to be searched is a dark blue Apple iPhone 15 with a clear case, hereinafter the "Device." The Device is currently located in the Evidence Control Room at the Federal Bureau of Investigation ("FBI") at 5425 W. Amelia Earhart Drive, Salt Lake City, Utah.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



## ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of 18 U.S.C. § 1349 (Wire Fraud Conspiracy), 18 U.S.C. § 1956(h) (Money Laundering Conspiracy), and 18 U.S.C. § 1956(a)(1)(B)(ii) (Money Laundering). And involve Jasso between September 2023 and November 2023.

   a. Any information regarding the destruction, transport, or selling of copper wire.

   b. Any conversations between Jasso, DeJarnette, and Delgado regarding the selling of copper wire.

   c. Any information related to the cashing of checks from the sell of copper wire and subsequent deposit methods and use of cash.

   d. types, amounts, and prices of specific transactions related to the selling of copper wire.

   e. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.